## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-107-TSC** |
| **MATTHEW CAPSEL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Capsel to thirty-one months' incarceration, near the middle of the advisory Guidelines' range of 27-33 months, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.   INTRODUCTION

Capsel participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

During the attack on the Capitol, Capsel joined thousands of rioters on the Lower West Terrace of the Capitol. While there, he encouraged other rioters and recorded a TikTok video

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

where he told his followers, "They only got so much mace and we got all these patriots we aren't going to run out, they are going to run out. Hold the line, don't run, go down with your eyes out and get some water to drink and hold your ground." *See* Exhibit 3. Capsel was also at the front line of the mob ascending the stairs to the inauguration bleachers on the Northwest side of the Capitol. He and the mob overwhelmed the officers and stood on the inauguration bleachers on the western side of the Capitol. At approximately 4:22 p.m. Capsel was part of a group of rioters who pushed against a police line on the Northwest side of the Capitol. Capsel encouraged other rioters to join the group push by waiving his hand and shouting, "come on." *See* Exhibit 1.

D.C. Mayor Muriel Bowser ordered a citywide curfew to take effect at 6 p.m. on January 6, 2021. That evening, at about 6:14 p.m., the D.C National Guard established a perimeter on the west side of the Capitol. After implementation of the curfew, Caspel and a mob of his fellow rioters confronted the line of D.C. National Guardsmen on the western perimeter of the Capitol near the Peace Monument. Capsel was on the front line of the mob and charged at the line of National Guard troops, pushing against them for seven seconds before troops deployed OC spray, which caused him to retreat. *See* Exhibit 4.

In the days following the riot, Capsel posted to Facebook, stating, "I tried to hold the line back till they sprayed me [freezing face emoji]." Caspel stated in another post, "On the 6 good men had to do a bad thing . . . ." Capsel also posted to the social media website TikTok. In one post, Capsel made a slideshow containing pictures of President Joe Biden, Speaker of the House Nancy Pelosi, and Senate Majority Leader Chuck Schumer with music. The music lyrics stated, "Wish you would die, just fucking die. Ever had a boss that was so damn bad, when you get to work it would drive you fucking mad. If this place burned down it would be kind of sad. But to be

away from him I would fucking be kind of glad. To do all the work, he takes all the cred, about to blow up on this bitch." *See* Exhibit 7.

The government recommends that the Court sentence Capsel to 31 months' incarceration, near the middle of the advisory Guidelines' range of 27-33 months, the range agreed to by the parties. A 31-month sentence reflects the gravity of Capsel's conduct, but also acknowledges his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 57 (Statement of Offense), at ¶¶ 1-7.

### B.    Capsel's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Capsel traveled to Washington, D.C., from his home in Ottawa, Illinois to protest Congress' certification of the Electoral College vote. He later participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, open-source video, surveillance footage from outside of the Capitol, and Capsel's social media posts.

Capsel first joined a large group of people who were marching East on Constitution Avenue, from the National Mall, towards the Capitol.



*Capsel highlighted with the yellow box.*

Capsel then arrived at the western side of the Capitol with thousands of other rioters. He was prepared for encounters with police and participation in a riot. As the riot grew increasingly violent and as police utilized OC spray to control the mob, Capel donned plastic safety eyewear.



*Capsel highlighted with the yellow box.*

4



*Capsel in the two pictures above against fencing on the Lower West Terrace*

After Capsel arrived at the Capitol Building he traversed the underside of the inaugural scaffolding, and pushed past police lines with other rioters.

5



*Capsel under the inaugural stage.*



*Capsel interacting with a member of the news media[2]*

---

[2] The Government is not aware of any specific acts of vandalism by Capsel other than his participation as a member of the mob on the Lower West Terrace. But that is not to say that the defendant does not bear responsibility for injuries and losses that occurred that day.   *See Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of this Court).



*Capsel on top of ledge*



*Capsel on Lower West Terrace near police barricades*

While on the Lower West Terrace, Capsel used his phone to post two videos on TikTok. In one video, Capsel can be seen wearing his plastic glasses while on top of the western side of the Capitol where he gleefully panned over the mob.



*Capsel on Capitol Scaffolding (Exhibit 2)*

In a second video, Capsel spoke directly to the camera stating, "They only got so much mace and we got all these patriots we aren't going to run out, they are going to run out. Hold the line, don't run, go down with you eyes out and get some water to drink and hold your ground." *See* Exhibit 3.

### *Capsel's Assaults on Police*

At approximately 4:20 p.m., Capsel joined a mob of other rioters who jointly pushed against police officers who were holding back rioters on the Lower West Terrace. During this group push, Capsel waived his hand, motioning for other rioters to join the group push against officers and called out to rioters to, "come on."



*Newly discovered conduct: Capsel pushing against officers*
*(Exhibit 1 between :05 and :10 mark)[3]*

---

[3] This is new conduct discovered by the government after Capsel entered his guilty plea. The government will not seek additional charges based on this conduct but wants to highlight it for the Court as aggravating conduct.

Capsel remained on Capitol grounds until police removed rioters from the Capitol and Capitol Grounds. Capsel continued to confront police in the vicinity of Capitol Grounds after it was secured and continued his acts of violence. After the Capitol was secured, he was recorded mocking a Metropolitan Police Department ("MPD") officer near Peace Circle outside of the Capitol stating, "got that badass paycheck you'll do anything for." *See* Exhibit 5. The officer told Capsel to keep walking. But Caspel retorted, "you didn't take an oath, why don't you answer the fucking question." *See id*. The officer then toldCapsel he did not need to answer the question and that Capsel should "serve and go home." Capsel responded, "You can suck my dick too." *See id*.

On January 6, 2021, D.C. Mayor Muriel Bowser ordered a citywide curfew to take effect at 6 p.m. that evening. Capsel ignored that order. That evening, at about 6:14 p.m., the D.C National Guard established a perimeter on the west side of the Capitol. In the evening hours of January 6, 2021, after implementation of the curfew, Capsel and a mob of other rioters confronted the line of D.C. National Guardsmen on the western perimeter of the Capitol near the Peace Monument. *See* Exhibit 6. Capsel was on the front line of the mob and charged at the line of National Guard troops, pushing against them and their riot shields. Capsel leaned his body at a 45-degree angle pushing against the line of troops for seven seconds before troops deployed OC spray, commonly referred to as pepper spray, which caused Capsel to retreat. *See* Exhibit 4.



*Capsel pushing against National Guard troops (Exhibit 4 at 21 second mark)*

### Capsel's Statements on Social Media

Federal investigators obtained Capel's videos and social media posts using tips and open-source searches of Capsel's Facebook and TikTok accounts. Those materials revealed that Capsel appeared to subscribe to the conspiracy theories, that he traveled to Washington, D.C., and that in the days following January 6, he had no remorse for his unlawful conduct on that day. When federal agents attempted to retrieve these posts and videos from Capsel's social media accounts, they had been deleted.[4]

---

[4] Agents were able to preserve Capsel's social media posts because the tips contained the content of the posts.

In the days following January 6, 2021, Capsel posted videos of himself fighting with the National Guard (Exhibit 4) to his Facebook page. Capsel titled the post, "I tried to hold the line back till they sprayed me [freezing face emoji]." Capsel also responded to a question about what the OC spray tasted like, he stated, "Like good hot sauce" and that he took off quickly "because it instantly burned."



*Facebook post by Capsel in the days following January 6, 2021*

Between January 6 and January 26, 2021, Capsel posted several videos to the social media website TikTok. In one post, Capsel made a slideshow containing pictures of President Joe Biden, Speaker of the House Nancy Pelosi, and Senate Majority Leader Chuck Schumer with music. The music lyrics stated, "Wish you would die, just fucking die. Ever had a boss that was so damn bad, when you get to work it would drive you fucking mad. If this place burned down it would be kind of sad. But to be away from him I would fucking be kind of glad. To do all the work, he takes all the cred, about to blow up on this bitch." *See* Exhibit 7.

***Capsel's Statements to Law Enforcement Officials***

Law enforcement officials arrested Capsel on January 26, 2021, for his January 6 crimes. While enroute to the jail, he admitted to the arresting officer that he had been in Washington D.C. on January 6. He also admitted to holding his ground and pushing back as he and others were pushed by officers.

Pursuant to the plea agreement, Capsel and his attorney participated in an interview by law enforcement officials on November 7, 2022. During his interview he admitted to traveling to Washington, D.C. by bus and staying in a tent he brought. He stated he attended the speech by former President Trump and traveled with the crowd to the Capitol. Capsel stated he did not observe serious acts of violence towards police, but he did hear from others that officers were getting injured. Capsel stated he did not enter the Capitol and that he considered it to be "sacred grounds."

Capsel stated he became agitated with the police when one of the officers slapped his phone out of his hand. He stated that shortly after that, he joined a crowd that pushed against riot police. He stated that after that, someone provided him with a plastic pipe for self-defense, but he discarded it shortly thereafter. He stated he left the Capitol Grounds after it was locked down, but he stayed in the vicinity of the Capitol. He admitted to pushing against National Guardsman and being pepper sprayed. Capsel then left the area and spent the night in a hotel before traveling home by train the next morning. He acknowledged the severity of his actions and expressed regret and remorse.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 30, 2022, a federal grand jury returned a two-count indictment charging Capsel

with Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), and Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1).

On September 2, Capsel pled guilty to a single-count superseding information, charging him with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

## IV.    STATUTORY PENALTIES

Capsel now faces sentencing for Civil Disorder in violation of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the U.S. Probation Office, Capsel faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The plea agreement and PSR correctly state the applicable guidelines. The agreed upon Guidelines analysis is:

Count One: 18 U.S.C. § 231(a)(3)

U.S.S.G. § 2A2.2(a)[5]          Base Offense Level          14

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1). Section 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct, not simply the conduct underlying the crime for which Caspel was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). Section 2A2.2 defines "aggravated assault" as, *inter alia*, "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt.n.1. The cross-reference in §2A2.4(c) applies here because the conduct charged in the indictment constituted an aggravated assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Here, Caspel directly pushed against National Guard troops on the west side of the Capitol near the Peace monument after 6pm. That conduct reflected both a threat that caused reasonable apprehensions of fear and a "willful attempt to inflict injury upon" the officers. In addition to being an assault, the civil disorder offense to which Caspel pled guilty is a felony punishable by up to 5 years in prison. *See* 18 U.S.C. § 231. That means that he conducted a "felonious assault." Notably, had Caspel been convicted under 18 U.S.C. § 111, his assault would qualify as a felony assault because, at a minimum, it involved physical contact when he directly pushed against National Guard troops, making physical contact with them. *See* 18 U.S.C. § 111(a) (simple assault may be punished for up to one in prison, but where assaultive acts "involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years"). The "felonious assault" here also qualifies as an "aggravated assault" as defined in U.S.S.G. § 2A2.2 cmt. n.1. Caspel's felonious assault "involved . . . an intent to commit another felony." *Id.* Here, the interference with police during a civil disorder in violation of 18 U.S.C. § 231(a)(3) involved the intent to commit the felony violation of assaulting, resisting or impeding certain officers (18 U.S.C. § 111(a)(1) and (b)). In other words, Caspel assaulted and interfered with officers engaged in the performance of their official duties by pushing against them. The § 2A2.4(c) cross-reference applies regardless of whether Caspel was charged with or convicted of the other felony (Section 111 here) that Caspel intended to commit. *See United States v. Thompson*, 60 F.3d 514, 518 (8th Cir. 1995) (defendant committed aggravated assault where defendant was convicted under Section 111 and his conduct involved the intent to commit state law robbery, where the state law robbery charge was later dismissed); *United States v. Rue*, 988 F.2d 94, 97 (10th Cir. 1993) (defendant committed aggravated assault where defendant

| | | |
|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

| | |
|---|---|
| **Combined Offense Level** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **17** |

*See* Plea Agreement at ¶ 5(A); and PSR ¶¶ 31-42.

The parties and U.S. Probation Office calculated Capsel's criminal history as category II, which is not disputed. Plea Agreement at ¶ 5(B); and PSR ¶ 49. Accordingly, based on the government's calculation of Capsel's total adjusted offense level, after acceptance of responsibility, at 17, Capsel's Guidelines imprisonment range is 27 to 33 months' imprisonment. Capsel's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the

---

was convicted under Section 111 and his conduct involved the intent to commit possession of a syringe and a controlled substance, where the defendant was charged with but not convicted of the latter offenses); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (defendant committed aggravated assault where he was convicted under Section 111 and his conduct involved the intent to commit the uncharged state-law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (defendant committed aggravated assault where he was convicted under Section 111 and his conduct involved the intent to commit the uncharged state law felony of intentionally attempting to disarm a law enforcement officer). This Court has applied the cross-reference in §2A2.4(c) in similar circumstances. *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24; United States v. Creek, 21-cr-48 (DLF), ECF No. 61 at 10-11.

offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Capsel's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed

evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, police officers; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards the recommended sentence. Capsel's statements inciting rioters to continue to engage with police, stating that officers "only have so much mace" and that "patriots" should "hold the line" exacerbated the violence that day. *See* Exhibit 3. And Capsel came prepared for violence. As he became more and more violent with police, he dawned protective glasses to protect him from the riot control measures deployed by officers.

Upon approaching the Capitol, Capsel unlawfully pushed past police on the western side of the Capitol. He was told that officers were being injured, but instead of deescalating his conduct, he became violent. While on the western side of the Capitol, Capsel incited the mob and violence and took part in violence. At approximately 4:22 p.m., Capsel joined a group of rioters against a line of out-numbered officers on the western side of the Capitol. *See* Exhibit 1. Before joining in a group push, he waived his hands, encouraging rioters to join him and said, "come on." He then participated in a coordinated push against officers to storm the Capitol. *See id*.

Capsel's day of violence was not over. He lingered on Capitol grounds as police secured the building and forced rioters from Capitol grounds. He continued to aggressively confront police, telling one officer to "suck my dick." *See* Exhibit 5. Even after Mayor Bowser ordered a curfew for 6 p.m., Capsel remained in the vicinity of the Capitol. After being confronted by members of

18

the National Guard, he charged their line and pushed into a line of Guardsmen for seven seconds before he was hit with OC spray and retreated. *See* Exhibit 4.

After the riot, Capsel celebrated his actions, showing no remorse or contrition in his social media postings. He posted videos of his actions to TikTok and Facebook, overlaying them with music, and commenting on them. He bragged to his friends about how he "tried to hold the line back till they sprayed me" and how "on the 6 good men had to do a bad thing." He then posted a video to TikTok showing pictures of President Joe Biden, Speaker of the House Nancy Pelosi, and Senate Majority Leader Chuck Schumer with music. The music lyrics stated, "Wish you would die, just fucking die." *See* Exhibit 7.

### B. Capsel's History and Characteristics

Capsel has a history of minor offenses that, in the aggregate, show a longstanding disregard for the law. PSR ¶¶ 43-48. Additionally, Capsel's criminal activity has escalated in recent years with acts of violence related to his 2020 Violation of Order of Protection, Criminal Trespass, and a dismissed charge of Domestic Battery. PSR ¶ 48.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense,

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                                                                              at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

this factor supports a sentence of incarceration. Capsel's criminal conduct, assaulting a police officers and encouraging others to continue the same, is the epitome of disrespect for the law. When Capsel entered the Capitol grounds, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. Capsel knew this before he contributed to the violence that day. In his post-plea interview with the FBI, he stated he was told police officers were being injured. After learning of this, Capsel did not leave Capitol Grounds, he escalated his conduct and contributed to the violence. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.       The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

weighs heavily in favor of a lengthy term of incarceration. First, Capsel has a criminal history category of II, showing that this arrest and conviction in this case was hardly his first brush with the criminal justice system. *See* Section VI(B) *supra.* Second, although Capsel has now expressed remorse, his social media statements after January 6 were those of a man who repeatedly chose violence, who refused to leave Capitol grounds, and who was proud of his actions. *See Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Capsel's posting of videos after January 6 showing Democratic leaders' pictures with music stating, "Wish you would die, just fucking die," were hardly the actions of someone who sincerely regretted their actions that day. Capsel's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his criminal history, rhetoric, and incitement of the crowd on January 6.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

22

(2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Capsel and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 231 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As of the date of this sentencing memorandum, 59 felony Capitol Riot defendants have been sentenced. Eleven of the 59 felonies were cases where the defendant pleaded to one count of § 231 as the sole charge. This Court has sentenced two defendants for a violation of § 231 – *United States v. Moises Romero*, 1:21-cr-00677 (TSC); and *United States v. Christian Glen Cortez*, 1:21-cr-00317 (TSC). However, these cases differ significantly from this case because they did not involve acts of physical violence. Because of this, the defendants in *Romero* and *Cortez* total adjusted offense levels were only eleven and eight, respectively.

Of the remaining nine January 6 cases where the court considered a conviction of only § 231, only one case involves similar conduct and a similar guidelines calculation to this case – *United States v. Thomas Hamner*, 1:21-cr-00689 (ABJ).[8] In that case, the court sentenced the defendant to 30 months in prison. On January 6, 2021, Hamner breached the perimeter fencing around the Capitol and joined with other rioters to wrestle away barricades erected to keep the mob from entering the restricted area. He and a group of rioters then shove a large, metal-framed

---

[8] Unlike Caspel, Hamner was charged with also violating 18 U.S.C. §§ 111(a)(1), three misdemeanor charges, and two counts of violating § 231(a)(3). He pled guilty to only one of the § 231(a)(3) counts and was sentenced on that guilty plea. The remaining charges remain pending.

billboard towards police officers on the West Plaza, fortunately not striking them with it.

Similar to Hamner, Capsel joined with groups of rioters on the West Plaza to assault officers. However, Capsel committed a second assault against National Guardsmen hours later as they secured the Capitol grounds. Capsel also encouraged the crowed and his social media followers to continue to "hold the line" and that officers would run out of riot control devices. Judge Berman Jackson sentenced Hamner to 30 months' incarceration, who remains subject to additional punishment for the other pending charges.

Capsel's conduct is similar to other defendants who pleaded to other felony charges. In *United States v. Matthew Miller*, 12-cr-00075 (RDM), the court sentenced the defendant to 33 months in prison. While on the Capitol grounds, Miller, a 22-year-old, threw a full beer can in the direction of police officers. After watching other rioters repeatedly assaulting officers in the Lower West Terrace entrance to the Capitol—commonly referred to as the "tunnel," the site of a prolonged siege and countless attacks on officers lasting over three hours—Miller chose to join them. He encouraged rioters to push against the police lines formed to keep the mob from entering, then unleashed the contents of a fire extinguisher directly onto officers in the tunnel. The court varied downward two levels—citing Miller's youth and his intoxication during the riot— and imposed 33 months in prison as well as 24 months of probation concurrent to a period of supervised release.

At the time of his offenses on January 6, 2021, Capsel was five years older than Miller. Even assuming that voluntary intoxication is a mitigating factor at sentencing, there is no indication Capsel was intoxicated when he stormed the Capitol. Indeed, he appeared quite sober throughout his criminal conduct that day. There is no reason to vary downward here.

27

Second, in *United States v. Greg Rubenacker*, 1:21-cr-00193 (BAH),[9] the court sentenced the defendant to 41 months in prison. Rubenacker was one of the first people to breach the Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building. Inside, he and other rioters chased USCP Officer Eugene Goodman through part of the Capitol, ignoring the officer's extended baton and repeated demands to "back up," and accosted other officers. Rubenacker left the building, only to breach it again elsewhere. This time, he pushed down the Senate Hall toward the Senate Chamber before being repulsed again by police deploying pepper spray. Retreating to the Rotunda, Rubenacker refused to leave and confronted multiple officers, screaming that they were "communists." When officers formed a line to force rioters out, Rubenacker swung a water bottle at one officer's head and threw liquid at other officers who were engaging with another rioter. Only after an officer sprayed a chemical irritant in Rubenacker's face did he finally leave the Capitol, over one hour after he initially breached the building. Following the riot, Rubenacker posted comments to videos on social media in which he did not show remorse ("America is pissed") and exuded pride for his participation in the riot ("Holy shit! This is history! We took the Capitol!").

Like Rubenacker, Capsel confronted officers: he joined the crowd in taunting police, participated in an assault on officers in a defensive line, and made multiple post-riot social-media posts boasting of his actions that day. Though Rubenacker breached the Capitol and Capsel did not, Capsel engaged in other conduct meriting a long period of incarceration: joining others in

---

[9] Rubenacker pleaded guilty to all nine counts in his superseding indictment without a plea agreement. They were violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3) (Civil Disorder) and six misdemeanors. The additional charges of conviction did not affect the Guidelines range of 41-51 months.

multiple assaults hours apart. Further, Capsel encouraged other rioters to continue because officers "only got so much mace." Therefore, Capsel deserves a mid-range sentence of 31 months.

Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, officers on the West Plaza and the National Guardsmen who came into contact with Capsel, did not suffer bodily injury as a result of Capsel's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Capsel must pay $2,000 in restitution to the Architect of the Capitol, which reflects

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

in part the role he played in the riot on January 6.[11]  Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.15" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Capsel's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 109.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 31 months, which is a near mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Brian Brady*
Brian Brady
Trial Attorney, Department of Justice
DC Bar No. 1674360
1301 New York Ave. N.W., Suite 800
Washington, DC 20005
(202) 834-1916
Brian.Brady@usdoj.gov

---

[11]  Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## <u>CERTIFICATE OF SERVICE</u>

On this 9th day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Brian Brady* _____
Brian Brady
Trial Attorney, Department of Justice