UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. 22-0107 TSC |
| : | |
| MATHEW CAPSEL, : | |
| Defendant. : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Mathew Capsel, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing. He respectfully requests that he be sentenced to the low end of his guideline range, with an additional downward variance for the reasons outlined below.

**PROCEDURAL BACKGROUND**

1. On September 2, 2022, the defendant pled guilty to the One Count Superseding Information charging him with Civil Disorder, in violation of 18 USC § 231(a)(3). Under the terms of the plea agreement, a conviction for Count 1 carries a maximum sentence of five years imprisonment; a term of supervised release of not more than three years, pursuant to 18 USC § 3583(b)(2) and a fine of not more than $250,000. The defendant has also agreed to make restitution in the amount of $2000.

2. The parties agree that Mr. Capsel's guidelines range is 27 to 33 months incarceration. However, the defendant reserved the right to argue for a Criminal History Category different from that as estimated in the Plea Agreement (Criminal History Category II). The plea agreement also reserved the right for either party to seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

3. Mr. Capsel submits that his criminal history category is overrepresented and that he should receive a downward variance for the reasons discussed in this memorandum.

## NO MATERIAL ERRORS IN PSR

2. There are no material errors in the Presentence Report (PSR).

3. The PSR, as well as the parties per the executed plea agreement, have both calculated Mr. Capsel's sentencing guideline range to be 27 - 33 months. *See*, PSR at ¶ 90 and Dkt. # 60 at ¶ C.

## GUIDELINES ARE NOT MADATORY

4. As it knows, the Court has broad discretion to consider every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must

first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101. The Court must impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.

## SENTENCING FACTORS

5. The core requirement of 18 U.S.C. § 3553(a) is that the court impose *"a sentence sufficient, but not greater than necessary"* to comply with the purposes of sentencing set forth in § 3553(a), which provides no order of priority among the factors. The factors outlined in § 3553(a) are as follows:

- The nature and circumstances of the of the offense and the history and characteristics of the defendant 18 U.S.C. § 3553(a)(1);

- the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A);

- the need for the sentence imposed "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

- the need for the sentence imposed "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2) (C);

• the need for the sentence imposed "to *provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner,*" 18 U.S.C. § 3552(a)(2)(D);

• the kinds of available sentences available, 18 U.S.C. § 3553(a)(3);

• the guidelines in effect at the date of sentencing and any pertinent policy statements, 18 U.S.C. § 3553(a)(4) and (5);

• "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6);

• "the need to provide restitution to any victims of the offenses," 18 U.S.C. § 3553(a)(7).

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

6. The is no question that the January 6 attack on the Capitol was horrific. However, Mr. Capsel did not destroy any government property, nor did he physically injure anyone. He did not come dressed for combat. Although someone handed him a PVC pipe on his walk to the Capitol, he quickly discarded it. He also never entered the Capitol. In complying with his obligation under the plea agreement, to debrief with the FBI, he told the FBI that he "considered the Capitol to be sacred grounds and knew anyone who entered would go to prison." As for

his overall actions that day, he simply stated that he "feels like an idiot" for having done what he did.

## *CHARACTERISTICS OF THE DEFENDANT*

**Crim. History Category Overrepresented**

7. Mr. Capsel has two criminal history points that result in his criminal history category of II. Both of these offenses resulted in a fine.

8. The first point comes from a 10.5-year-old conviction for consumption of liquor by a minor and trespass on state land when he was 19 years old. The second point came from a violation of a protection order and a criminal trespass case. This is a recent offense and came about during a contentious dissolution of Capsel's marriage, which involved a custody dispute involving his 3 minor children.[1] This dissolution of marriage is now complete, and the defendant pays $1000 a month child support. He shares partial custody of his minor children.

9. To elevate Capsel to a criminal history category II for consumption of liquor on state property when he was 19 years old unnecessarily elevates his actual propensity to engage in unlawful behavior. Understandably, the domestic dispute calls for quantification, but this practically aged out fine punishable offense augurs

---

[1] The dissolution of his marriage had a traumatic impact on Capsel's wellbeing. *See*, PSR at ¶ 69. Capsel is quite close to his 3 children. In his debriefing with the FBI, he also attributed his lapse in judgment on January 6, in part, due to his confused emotional state resulting from the fall out of his marriage failing.

well to a 1-point reduction of his criminal history, resulting in a guideline range of 24 to 30 months (Offense Level 17 – Criminal History Category I). U.S.S.G §4A1.3 (b)(1).

**Lack of Role Model When Growing Up**

10. Capsel was raised in a small town in Illinois. His father, an alcoholic and described by Capsel as being "absurd and obnoxious", abandoned the family when Capsel was 2 years old. In a large city, something like this can go unnoticed. In a small town in Illinois, everyone notices, and at the end of the day, the children suffer. To further complicate the situation, his Mom married a man, when Mathew was 10 years old, who was physically abusive to both Mathew and her. These events all severely traumatized Capsel, as is evidenced by his detention as a 16-year-old teenager, preceded by an earlier near-death experience at age 15. See PSR at ¶ 68.

**Overall Characteristics**

11. Mathew Capsel is a walking example of how you cannot always "judge a book by it cover." He is a physically imposing man, who speaks softly, listens when spoken to and speaks with a "diamond in the rough" air of intelligence. If you were to put him behind a screen and converse with him, knowing nothing about him, you would be shocked by his appearance and background. Although he

did not have the parental guidance that he apparently needed,[2] he understands right from wrong and does not back pedal on his accountability for the conduct he engaged in on January 6. He knows it was wrong and feels ridiculous and truly remorseful for what he did.

      12. Facing incarceration, Capsel's main concern is that he is not going to be able to provide for his 3 children. He works hard at a physically exhausting job in the elements year-round. Yet he is proud of his work and his ability to care for his children to whom he provides $1000 a month in court approved child support. Though his ex-wife has full custody, Mr. Capsel has the children every other weekend.

      13. As probation noted at the end of its report, in an observation shared by Capsel's mother,[3] there is some concern how the children will make out while Mr. Capsel is incarcerated. As is usually the case, it is the children that feel the brunt of untoward events. Mr. Capsel seeks a downward variance to mitigate the impact of his inability to support his children while incarcerated.

**DETERENCE, ADEQUATE PUNISHMENT, AND PUBLIC SAFETY**

      14. Mr. Capsel understands and accepts the fact that there are consequences

---

[2] He did act out as a juvenile, which resulted in what can best be described as a scared straight detention in a juvenile facility.  To his credit, Mr. Capsel has not been a frequent visitor to the criminal justice system since that detention.
[3] *See*. PSR at ¶ 60.

for his behavior on January 6. However, the likelihood of him being a danger to the public is practically non-existent. He did not engage in a violent assault; he pushed back on a group of guardsmen and in the process made physical contact with one of their riot shields. The incident last for less than 5 seconds, at which time Capsel was pepper sprayed. He pulled back in full retreat after this brief incident.

## UNWARRANTED SENTENCING DISPARITIES

15. To its credit, the United States has gone through great lengths to implement a fair charging process for those participating in the unlawful assault of the Capitol on January 6. It has also paid particular attention to the types of pleas extended, no doubt with a series of review processes in place. However, after a year and a half of plea negotiations, involving multiple prosecutors, Mr. Capsel's plea has always required a guideline cross reference to aggravated assault (§2A2.2). The legal mechanism for this guideline is there, but when looks at other defendant charges and plea offers, there is an unwarranted disparity.[4]

**No. 22-cr-52 RCL. Nolan Cooke (12 months and 1 day)**

16. This defendant pled guilty to 18 U.S.C. 231(a)(3). He had no criminal record. He was not required to agree to sentencing under U.S.S.G. §2A2.2. Despite the fact his stated purpose was to "stop the steal", which amounted to committing

---

[4] The facts that follow were obtained from government sentencing memoranda filed against each of the named defendants.

the offense of conviction with intent to commit another felony. He behaved much as Caspel did that day. Cooke forcibly pushed through a bicycle rack barrier and encouraged others to likewise break through the line of police officers. He continued to push through a crowd of police offices, yelling obscenities at them, having physical contact with some of them in the process. Cooke used a flagpole, with an American flag attached thereto, to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass."

17. However, unlike Capsel, Cooke threatened officers and encouraged other rioters to "get them [the officers]" and "get these motherfuckers." Cooke eventually left the restricted area without entering the building soon after his eyes became irritated with pepper spray.

**No. 21-cr-677 TCL. Moises Romero (12 months and 1 day)**

18. This defendant pled guilty to 18 U.S.C. 231(a)(3). He had no criminal record. He was not required to agree to sentencing under U.S.S.G. §2A2.2. Despite the fact his stated purpose was to "stop the steal", which amounted to committing the offense of conviction with intent to commit another felony.

19. Romero came to the Capitol ready for a confrontation with police, wearing a dual-cartridge respirator and eye-protection safety glasses. Romero entered the restricted Capitol Grounds and took videos of rioters assaulting officers

with poles and a fire extinguisher in the West Plaza. He joined a group of rioters that pushed past police to occupy bleachers set up for the inauguration, and later led a group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain entrance to the Capitol, grabbing the edge of an officer's riot shield in the process. After spending about 15 minutes celebrating, taking videos, and entering Senator Merkley's office, Romero left the building, only to return to the east side of the Capitol, joining yet another group of rioters trying to gain entrance to the Capitol through the Rotunda Doors. The next day, Romero posted a video on social media, proudly displaying himself inside and around the Capitol Building.

20.  Romero's conduct was arguably more egregious than Capsel's.

**No. 21-cr-186 CRC. David Blair (5 months).**

21. This defendant pled guilty to 18 U.S.C. 231(a)(3). He had no criminal record. He was not required to agree to sentencing under U.S.S.G. §2A2.2. Despite the fact he had several charges dismissed as part of his plea, including an obstruction of the electoral count charge. He obviously committed the §231(a)(3) offense with intent to commit another felony.

22.  Blair, who is 6 feet tall, weighs 200 pounds and was 26 years old at the time, came to the Capitol grounds on January 6 wearing a skull-themed neck gator,

which he had pulled up over his lower face, Oakley "tactical" gloves, and carrying a lacrosse stick with a large Confederate battle flag attached to it. He was also wearing a backpack that contained a knife with a serrated blade approximately four inches long and a roll of duct tape.

23. While on the Capitol's West Lawn, Blair loudly announced he would not comply with verbal commands being issued by multiple police officers for him and other rioters to leave the Lawn, and blatantly encouraged other rioters to do the same. An officer pushed Blair back with his baton. Blair resisted and encouraged others to resist. Blair then pushed his lacrosse stick against a police officer's chest, and as a result was promptly detained and arrested. Blair conduct is arguably much more egregious than Capsel's, yet he was sentenced to 5 months incarceration.

**No. 21-cr-551 TFH. Robert Fairchild Jr.  (6 months)**

24. This defendant pled guilty to 18 U.S.C. 231(a)(3). He had no criminal record.  He was not required to agree to sentencing under U.S.S.G. §2A2.2. Despite the fact he had several charges dismissed as part of his plea, including an obstruction of the electoral  count charge. He obviously committed the §231(a)(3) offense with intent to commit another felony.

25. Fairchild unlawfully broke into the U.S. Capitol Building to disrupt the peaceful transfer of power.  He took part in dragging multiple barriers back from

the front line and into the crowd, which helped the growing mob eventually reach the Capitol Building. He also pushed against multiple police officers, individually and as part of a crowd, adding to the constant barrage that eventually caused police to retreat and allowed the building to be breached. Fairchild then entered the Capitol Building, and gleefully chanted "Fight for Trump" while inside.

## CONCLUSION

26. Mr. Capsel accepts the fact that there are consequences for his behavior on January 6. However, he asks this Court to recognize the previously discussed disparities, his family obligations, and his trauma related mental health needs when sentencing him. He suggests that a sentence of 1 year and 1 day is a *"sentence sufficient, but not greater than necessary"* to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,
_____/s/_____
Christopher M. Davis #385582
Counsel for Mathew Capsel
Davis & Davis
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
202.234.7300

CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was served on the United States via the Court's CM/ECF System on this 9th day of December 2022.

/s/
Christopher M. Davis