UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .   CR No. 22-0107 (TSC)
                                .
     v.                         .
                                .
MATTHEW CAPSEL,                 .   Washington, D.C.
                                .   Friday, December 16, 2022
          Defendant.            .   4:06 p.m.
. . . . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          BRIAN D. BRADY, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530
                             (202) 252-7566


For Defendant:               CHRISTOPHER M. DAVIS, ESQ.
                             Davis & Davis
                             1350 Connecticut Avenue NW
                             Suite 202
                             Washington, DC 20036
                             (202) 234-7300


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                        P R O C E E D I N G S

2              THE DEPUTY CLERK:  Your Honor, we have criminal

3    action 22-107, United States of America versus Matthew Capsel.

4    We have Mr. Brian Brady representing the government,

5    Mr. Christopher Davis representing Mr. Capsel, all appearing

6    in person.  And we also have Ms. Kelli Willett representing

7    Probation, and she's here in person as well.

8              THE COURT:  Good afternoon, everyone.  Nice to see you,

9    Ms. Willett.  We're here for the sentencing of the defendant,

10   Mr. Capsel, who has pleaded guilty to civil disorder in

11   violation of 18 U.S.C. § 231(a)(3).

12        Just a reminder to anyone who might be listening to these

13   proceedings, or participating in any way, recording any part

14   of these proceedings is strictly prohibited pursuant to

15   federal and local court rules.

16        So in preparation for this sentencing here's what I've

17   gotten and received:  The presentence report and sentencing

18   recommendation from the probation office; and I've looked at

19   obviously the plea agreement which I looked at at the plea;

20   sentencing memoranda from the government and Mr. Capsel;

21   additional video exhibits from the government, all of which I

22   viewed; as well as the statement of offense and the documents

23   I originally viewed as part of this plea.

24        I think -- is this your first time appearing in person in

25   front of me, Mr. Capsel?  I believe we did your plea remotely.

1     Is that correct?

2             THE DEFENDANT:  Yes, Your Honor.

3             THE COURT:  Let me first begin with the presentence

4     report.  The final presentence report and sentencing

5     recommendation were filed on December 12, 2022.

6         Mr. Brady, is there any objection to the factual

7     determinations set forth in the presentence report?  I know

8     that -- I don't believe -- hold on.  It indicates that you

9     don't have any.  I'm just asking with regard to the facts.

10    Are there any objections with regard to the factual

11    recitation?

12            MR. BRADY:  No, Your Honor.

13            THE COURT:  All right.  Are you expecting any witnesses

14    today?

15            MR. BRADY:  No, Your Honor.

16            THE COURT:  Okay.

17        Mr. Capsel, are you fully satisfied with the services of

18    Mr. Davis as your attorney in this case?

19            THE DEFENDANT:  Yes, Your Honor.

20            THE COURT:  Have you had enough time to talk with

21    Mr. Davis about the probation department's presentence report

22    and the papers that have been filed by the government in

23    connection with the sentencing?

24            THE DEFENDANT:  I have.

25            THE COURT:  Okay.  Mr. Davis, have you and Mr. Capsel

1    read and discussed the presentence report?

2         MR. DAVIS:  We have.

3         THE COURT:  Are there any disputed issues of fact?

4    That is, does Mr. Capsel have any objection to any of the

5    factual statements set forth in the report?

6         MR. DAVIS:  No.  No objections.

7         THE COURT:  Having heard that there are no objections,

8    I will accept the factual recitation in the presentence report

9    regarding the circumstances of the offense.  Therefore, the

10   facts as stated in the report will be my findings of fact for

11   purposes of this sentencing.

12      Let's discuss the guidelines, which I think I mentioned to

13   you at your plea.  The presentence report lays out the

14   probation office's calculation of the advisory guideline range

15   that applies in this case.  And this calculation was done

16   using the 2021 guidelines manual and is as follows:

17      Beginning with the guidelines offense level, the applicable

18   guideline in this case is §2A2.2(a), which has a base offense

19   level of 14.  Because the victim in this case was a government

20   officer and the offense of conviction was motivated by such

21   status, sentencing guideline §3A1.2(a)(1) and (2), and the

22   applicable Chapter 2 guideline is from Chapter 2, part A,

23   offenses against the person, six levels are added under U.S.

24   Sentencing Guidelines §3A1.2(b).

25      However, the government has represented that Mr. Capsel has

1    demonstrated acceptance of responsibility in a manner that

2    entitles him to a two-level reduction under §3E1.1(a), and

3    that Mr. Capsel assisted authorities in the investigation and

4    prosecution of this matter in a manner that also entitles him

5    to an additional one-level reduction under §3E1.1(b).

6         Therefore, before I discuss or consider any departures or

7    variances, Mr. Capsel's total offense level is 17.  Are there

8    any objections to the calculation of this offense level,

9    Mr. Brady?

10             MR. BRADY:  No, Your Honor.

11             THE COURT:  Mr. Davis?

12             MR. DAVIS:  No, Your Honor.

13             THE COURT:  All right.  With regard to the criminal

14   history category, presentence investigation has found that

15   Mr. Capsel has two prior convictions that receive criminal

16   history points in the guidelines manual, and that these

17   convictions give him a criminal history point subtotal of 2,

18   which puts him in criminal history category II.  Mr. Capsel's

19   counsel contends in a memorandum that a category of II

20   overrepresents Mr. Capsel's criminal history.  And I agree.  I

21   do not think that the offenses providing the two points fairly

22   place him in this category.

23        But, Mr. Davis, as I understand it, you're not objecting,

24   you're not saying the calculation of 2 is incorrect?

25             MR. DAVIS:  I'm not saying it's incorrect.  I'm arguing

1    that it is overrepresenting his actual --

2         THE COURT:  I agree.  I think it is a correct

3    calculation of his criminal history, but I actually agree that

4    it does overrepresent given the charges in this case.

5      Mr. Brady, do you object to the presentence report's

6    criminal history calculation?

7         MR. BRADY:  No, Your Honor.

8         THE COURT:  Okay.  Based on the offense level and the

9    appropriate in this case -- well, the accurate criminal

10   history category of II, the presentence report calculates the

11   guidelines sentencing range to be 27 months to 33 months of

12   imprisonment.  However, as I said, because I believe that that

13   criminal history category overrepresents Mr. Capsel's criminal

14   history, that range, if I do not give him the subtotal of 2,

15   his range then goes down to 24 to 30 months.

16     Ms. Willett, is that accurate?

17        PROBATION OFFICER:  Yes, Your Honor.

18        THE COURT:  All right.  Thank you.

19     So that's the range I'm going to be working with.  I

20   realize the government has asked for a sentence in the middle

21   of the range that the parties calculated, which I think he's

22   been asking for 33 months which is in the middle of the

23   guidelines range.  Which I'm not saying it's wrong, it's just

24   that I'm not going to give him the extra points for the

25   criminal history category.

1    So, having determined the applicable range -- or the

2    range that I'm going to be applying here, the next step is

3    for me to consider departures.  The presentence report does

4    not include any departure grounds, and under the terms of the

5    plea agreement, both parties have agreed that there are no

6    grounds for imposing a sentence outside of the guidelines

7    range that is based on policy statements in the guidelines

8    manual.  Is that correct, Mr. Brady?

9         MR. BRADY:  That's correct, Your Honor.

10        THE COURT:  Mr. Davis.  I know you're asking for

11   a variance, but as far as departures, is that correct?

12        MR. DAVIS:  That's correct.

13        THE COURT:  Now, §3553 requires me to consider a

14   variety of factors, including the sentencing range the

15   guidelines prescribe, which I've just discussed, and also

16   the applicable penal statutes.

17     As I told you at your plea, Mr. Capsel, the charge of

18   civil disorder in violation of 18 U.S.C. §231(a)(3) carries

19   a statutory maximum penalty of five years of imprisonment.

20   I could give you five years is what I'm saying.  There is no

21   mandatory minimum.  Because the offense is a Class C felony,

22   Mr. Capsel is eligible for one to five years of probation

23   under the statutes.  However, under the guidelines, he is

24   ineligible for probation.

25     If a term of imprisonment is imposed, the statutes provide

1    that Mr. Capsel faces a supervised release range following

2    imprisonment of up to three years, while under the guidelines

3    that range is one to three years.

4        The statute of conviction sets a maximum fine of up to

5    $250,000, while the guidelines fine range is between $10,000

6    and $95,000.  A special assessment of $100, which is per

7    felony count, is mandatory.

8        In addition, as part of his plea agreement, Mr. Capsel

9    agreed to pay restitution of $2,000 to the Architect of the

10   Capitol.

11       Counsel, have I stated accurately the statutory and

12   guidelines framework under which we're operating, Mr. Brady?

13           MR. BRADY:  Yes, Your Honor.

14           THE COURT:  Mr. Davis.

15           MR. DAVIS:  Yes.

16           THE COURT:  Now, before I discuss the other sentencing

17   factors, I believe you all know, but I will just state that

18   the probation office has recommended, taking into account the

19   guidelines range and the available sentences and all the

20   factors, 18 months of incarceration and no probation, 24

21   months, two years of supervised release, and no fine.  The

22   recommendation of the probation office is not based on any

23   facts or circumstances that have not already been revealed to

24   the parties in the presentence report.

25       All right.  At this point I'm going to give the parties

1    an opportunity to address the Court.  Mr. Capsel, I think --

2    when Mr. Brady's finished talking and when Mr. Davis is

3    finished talking I think I told you at your plea that you'd

4    have an opportunity to speak if you wish.  You don't have to

5    and I don't hold it against you if you don't, but if you do,

6    that will be your opportunity.  But first let me hear from

7    Mr. Brady on behalf of the government.

8              MR. BRADY:  Good afternoon again, Your Honor.

9              THE COURT:  Good afternoon.

10             MR. BRADY:  May I publish a PowerPoint presentation

11   I prepared?

12             THE COURT:  Yes, you may.

13             MR. BRADY:  Your Honor, on January 6 a violent mob

14   attacked the United States Capitol.  Your Honor has seen and

15   heard a number of these cases.  I don't need to go over the

16   severity of the offenses that took place that day.  But this

17   defendant's role in that day was significant.  He didn't go

18   into the Capitol but he encouraged others to hold the line, to

19   push up against officers.

20      At the time of his plea, the government agreed with defense

21   counsel to the plea agreement given that he pushed up against

22   a line of National Guard troops later on in the evening,

23   staying well beyond the length of time that most of the

24   rioters that day stayed at the Capitol.  In the interim we

25   found that he pushed up against a second line of rioters at

1    about four o'clock or 4:20 that afternoon, and he encourages

2    rioters to "come on, come on," waving his hand.

3        This defendant's actions that day were aggravated and

4    deserve a lengthy term of incarceration.  We're going to ask

5    Your Honor, and we have asked Your Honor for a 31-month

6    sentence in this case.  I believe I termed it the near-mid.

7    I think 30 months would have been in the middle of the

8    guidelines given his criminal history category.

9        Going over the 3553(a) factors, Your Honor, looking at the

10   nature and circumstances of the offense and the history and

11   characteristics of the defendant, this defendant -- and I'm

12   not going to play all seven videos, Your Honor.  I know you've

13   watched them all.

14           THE COURT:  Watched them all.

15           MR. BRADY:  I will play three of them, Your Honor.

16   I'm happy to go through them quickly.  Exhibit 3, Your Honor.

17       (Video played.)

18       This defendant's words that day broadcast out to social

19   media telling rioters around him both orally and through

20   technology to hold the line, that the police officers that day

21   defending the constitutional process that was taking place for

22   the peaceful transfer of power, that they only had so much

23   mace, to hold the line, to hold their ground, and to not run.

24       This defendant's actions that day encouraged other rioters

25   to continue to fight officers that day.  This defendant, in

1   his interview with law enforcement and with Pretrial Services,

2   mentioned that the Capitol is a sacred ground and he didn't go

3   inside, but he's encouraging other rioters to attack police

4   and fight with police.  This defendant told other people to

5   get water to rinse the tear gas and the OC or the riot control

6   measures from their eyes.

7       This defendant then continued on.  Government Exhibit 1.

8   And I apologize, Your Honor, I don't believe I asked Your

9   Honor if we could move Government's Exhibits 1 through 7 into

10  evidence for purposes of this hearing.

11          THE COURT:  Mr. Davis?

12          MR. DAVIS:  No objection.

13          THE COURT:  The motion is granted.  They can be

14  admitted for purposes of this hearing.

15          MR. BRADY:  Thank you, Your Honor.  Government Exhibit 1.

16      (Video played.)

17      This defendant in this video is seen holding the line,

18  waving on others to join him.  Again, it's repeated actions by

19  this defendant in that day, consistent behavior by this

20  defendant to encourage other rioters to violate the law, to

21  encourage other rioters to be violent that day.  You can't

22  have a riot without the mob, Your Honor.

23          THE COURT:  Are you quoting me to myself, Mr. Brady?

24          MR. BRADY:  I am quoting yourself, and I'm also quoting

25  Judge Hogan in *U.S.A. v. Sandoval,* a trial I had with Judge

1    Hogan.

2              THE COURT:  And I was quoting Judge Hogan, that's true.

3              MR. BRADY:  There are a lot of these cases, Judge.  And

4    I'm not saying that to think that Your Honor takes this any

5    less or more serious.  But this was a historic event that will

6    forever be something in the history books.  And it wouldn't

7    have taken place if not for each and every individual rioter

8    out there that day.

9         The actions of the mob, the actions of the rioters, sent

10   the vice president of the United States, the speaker of the

11   House of Representatives, and all of our elected

12   representatives fleeing for their lives.  And this defendant

13   is out there telling them to come on and come on.

14        Exhibit 7, Your Honor, from later on that evening.  The

15   government's contention is that it's additional aggravation

16   that this defendant continues to engage in violence but also

17   lingers on the Capitol grounds.  This takes place with

18   National Guard troops that are outside.  So we know it's after

19   6 p.m. when Mayor Bowser had issued the curfew order.

20        He charges at the line, he pushes against the officers, and

21   he pushes against the line of National Guard troops by

22   himself.

23        (Video played.)

24        Your Honor, unlike the prior interaction he had where he

25   was one of many and encouraging others to join, this time he

1    is seen almost by himself entirely moving back an entire line

2    of officers and enlisted members of the D.C. National Guard

3    holding a line to protect the Capitol.  He continues to push.

4        I anticipate Mr. Davis will get up and say it was but five

5    seconds or seven seconds, but it was that short a period of

6    time but for -- the only reason why is because he was sprayed.

7    Mr. Capsel later on that day, not being remorseful, posts on

8    Facebook that he tried to hold the line until they sprayed him

9    and then jokes, it tasted like hot sauce.

10       Pushing against the police line that day, Judge, remaining

11   on Capitol grounds, encouraging others, and then going on

12   social media with the Exhibit 7 that you've seen with --

13   whether or not it's his meme with the photos of Nancy Pelosi,

14   Senator Schumer with the words "just f'ing die, just f'ing

15   die," more expletives than I'm going to use in court here

16   today, shows you exactly how remorseful he was that day.  I'll

17   quote Your Honor later on in here, but he wasn't remorseful on

18   January 6, he wasn't remorseful on January 7, and he was only

19   remorseful after he was caught.

20       Mr. Capsel perhaps is a very nice gentleman, but he went

21   to January 6, he drove a significant distance from Illinois.

22   He had every opportunity to turn around.  He didn't just get

23   into one violent encounter with the police; he got into multiple.

24   And every time he made a conscious decision to not leave the

25   grounds, to not go back home, but to continue to encourage the

1    mob and to continue his violence that day.

2        I anticipate Mr. Davis is going to tell you that he didn't

3    enter the Capitol.  The government's response is that, despite

4    the best efforts to get into the Capitol.  But for the police

5    officers holding that line, that's the reason he didn't get

6    into the Capitol that day.  He approached from an area that

7    the police were able to hold.

8        He didn't injure anyone.  Again, despite his best efforts

9    to encourage the mob to attack, despite his best efforts to

10   push against them to break through.

11       That he was not dressed for war that day like some other

12   rioters that Your Honor might have seen, with gas masks and

13   things.  But he did bring eye protection.  He didn't go to

14   the United States Capitol with a sign to protest peacefully;

15   he brought goggles that you would use for painting or to keep

16   spray off yourself because he knew what he was going to expect

17   that day and that was riot control measures because he was

18   there for a fight.

19       Mr. Davis will argue that he has a troubled past, that he

20   has a long history of people disappointing him and letting him

21   down.  And while sympathetic, every time he's encountered the

22   criminal justice system -- and it's lengthy, but as Your Honor

23   says, it might be Category II but it might reflect more

24   accurately as a Category I -- the justice system gave him

25   leniency.  And what did he do with those chances, the first,

1      the second, the third?  I believe there are 12 different

2      offenses.  Every single one of those times, it doesn't change

3      his behavior.

4           Mr. Davis, in the memo, says that his intelligence is

5      like a diamond in the rough.  Even the defense admits he's

6      intelligent enough to know what his actions are and what he

7      should be doing that day was wrong.  He was given leniency,

8      Judge, and it never worked.  Leniency today is not going to

9      change his past course of conduct.

10          And again, I'm going to quote Your Honor.  His feeling

11     remorseful only after he was caught.  Your Honor's quote:  As

12     the defendant's remorse didn't come when he left the Capitol,

13     it didn't come when he went home, it came when he realized he

14     was in trouble.  From Matthew Mazzocco on October 4, 2021.

15          Again, 3553(a)(2), the need for sentencing to be imposed,

16     the four different factors, to reflect the seriousness of the

17     offense.  Your Honor, January 6 is not just a civil disorder,

18     a one-off.  This is a once-in-a -- well, hopefully

19     once-in-a-lifetime event, a country-defining event, something

20     that will define the U.S. Capitol and define this courthouse

21     for generations.  That is serious.

22          There is a need for general deterrence, to show the people

23     around the country of whatever political persuasion that this

24     country is a country of laws and a country of laws and

25     peaceful transfers of power, and the actions that day are not

1    ones that this court, that the justice system and the laws

2    do not stand for.

3        We need specific deterrence for this defendant in his

4    actions.  His boasting, his encouragement of the rioters and

5    his continued acts of violence.

6        To protect the public from this defendant.  And I left the

7    last one in there: to provide the defendant with the needed

8    educational or vocational training.

9        And sentencing disparities, Judge.  I'll quote from the

10   *United States v. Bartlett*.  The government's position would

11   be that there are a large number of these cases, and there are

12   things we can look at that are similar to Mr. Capsel's case,

13   and in every single case we can find a lot that's very

14   different.

15       Every defendant is very different.  Every case is very

16   different.  This defendant had multiple acts of violence

17   throughout different hours of the day, pushing against

18   National Guard troops is very unique compared to most

19   defendants.

20       The guidelines are there in place, as Your Honor knows,

21   to ensure that there aren't disparities.  And the government

22   would be asking you for a guidelines sentence, whether that

23   be with the original guidelines as we calculate them, or under

24   criminal history category I as Your Honor stated earlier

25   today.

1    We believe that that would be the best way to ensure there

2    are not disparities between judges, between defendants who

3    have done different acts but still acts that violated the law,

4    §231, or 111, which is really what this defendant did as well.

5        Your Honor, this defendant and his actions that day by

6    encouraging the mob caused damage to the Capitol, damage to

7    our constitutional republic, and his encouragement of those

8    other rioters to engage with the police, and being out there,

9    the damage cannot be quantified, Your Honor.  How many rioters

10   joined those pushes against police, how many other rioters

11   continued their fight because of his actions, because of his

12   boldness in saying all that, we'll never know.

13       This defendant's deserving of a term of incarceration of

14   31 months, both specific deterrence to deter him in the future

15   from doing this, but also to deter others who might do

16   something like this the next certification, or the next

17   inauguration, or the next election.

18       Pending questions from the Court, that's all I have,

19   Your Honor.

20       THE COURT:  Thank you, Mr. Brady.  I appreciate your

21   presentation.  Mr. Davis?

22       MR. DAVIS:  Thank you, Your Honor.

23       Your Honor, first of all, I'd like to point out I really

24   don't see a history of showing disregard for the law.  I see

25   at age 19 he possessed liquor on state property.  I don't see

1       anything -- I just don't see anything, a complete disregard

2       for the law.

3              THE COURT:  I'd say a history of run-ins, minor run-ins

4       with the law.  But I agree with you, nothing serious.  Nothing

5       that doesn't suggest that he cannot turn his life around.  I

6       think he's entirely capable of doing that.  And that's why I'm

7       not giving him those two points.  Excuse me, that's why I'm

8       not giving him that subtotal.

9           But I take Mr. Brady's point, which is he's been having his

10      run-ins with the law and they don't seem to have made much of

11      an impact on him, and he was here on the 6th.  But I think

12      you've won that point with regard to his criminal history

13      category.

14             MR. DAVIS:  I just think it's unfair to characterize

15      him as being some type of criminal that has complete

16      disregard --

17             THE COURT:  I wouldn't characterize him that way.

18      I agree.

19             MR. DAVIS:  Dog running at large, I mean, come on.  I

20      don't think that's something that society is concerned about.

21          At the second line, characterized as an assault by

22      Mr. Capsel on other law enforcement, I note he's in the back

23      of the group.  He shouldn't have been there participating in

24      something that involving a group is dangerous, but he didn't

25      have physical contact --

1          THE COURT:  But you saw the pictures of him pushing

2    against the officers later that evening, right up against

3    their riot shields.

4          MR. DAVIS:  I do.  And, you know, this was something

5    that I spent a lot of time talking to him about, and I spent

6    a lot of time actually researching it.  If you look at that

7    videotape, there are two women standing up in the front, and

8    they're giggling as the National Guard are pushing them back.

9    And Mr. Capsel, in a lapse of judgment, and perhaps a moment

10   of chivalry, goes up and pushes the guard back.  He's a big

11   guy.  But did he --

12         THE COURT:  That's an assault, Mr. Davis.  I mean,

13   I've seen the video --

14         MR. DAVIS:  I understand.

15         THE COURT:  I've seen the video.  I understand the

16   severity of what he did.  I have watched hours of videos of a

17   lot of defendants, and I certainly feel like I can place his

18   in context with other things I've seen which are worse and

19   others which are not as drastic.

20         MR. DAVIS:  He had no weapons.  He wasn't wielding

21   any type of weapon.  He wasn't intentionally trying to harm

22   anyone.  Although I will agree with the Court, and I think

23   that it's undeniable that participating in a group has the

24   potential for harming people.

25         THE COURT:  People were harmed by the group that day.

1     Not maybe in the group he was in, but people were seriously

2     harmed.  Let's -- you know.

3          MR. DAVIS:  It's a little bit different than

4     intentionally trying to harm someone versus a lack of

5     judgment --

6          THE COURT:  "Hold the line"?

7          MR. DAVIS:  Well, hold the line, engaging in conduct

8     that is dangerous, I mean, that's a lapse of judgment more

9     than an intentional act of someone to harm someone.  And I'm

10    not saying that that justifies it, but I think there's a

11    range, there's a spectrum here.  And I think that considering

12    what we're considering here, he's at the lower end of the

13    spectrum.

14       The TikTok video was a repost.  It was stupid, but it was

15    a repost, the one that posted the lyrics and had pictures of

16    politicians.

17       The eye protection, someone gave it to him when he was out

18    there.  He didn't arrive at the Capitol with that.

19       Back at the time all this occurred, the one offense that he

20    has that really qualifies as an offense is the one involving

21    the dissolution of his marriage.  He was going through a lot

22    back then.  It doesn't excuse anything, but he was going

23    through a lot.

24       He has kind of a tortured history in terms of dealing with

25    issues.  I'm not going to go into a great deal of detail here

1    on record about this, but Your Honor can see from the

2    presentence report there have been some very, very severe

3    incidents of giving up on Mr. Capsel's part.

4         And I think at the time that he came to Washington, it was

5    at a point where the pandemic was weighing in on people, a lot

6    of people weathered it better than others.  He certainly

7    wasn't weathering it well.  Combine that with the dissolution

8    of his marriage.  I think that he was not acting as he would

9    normally act.  I think it's inconsistent with his background.

10        He has that one run-in as a juvenile.  It's not so much

11   that the abusive childhood makes you a criminal, but he was

12   acting out back then, and to his credit -- he was incarcerated

13   as a juvenile for that offense, which is a little bit unusual

14   for the type of offense he had.  I think it was a tampering

15   with a car or unauthorized use of a vehicle or something along

16   those lines.

17        But I'd submit to Your Honor that he straightened up after

18   that, because you look at him after that, and that was at age,

19   what, 15?  He's 29 now.  The only problems he's really had,

20   the only significant problems he's had with the law is what

21   we're standing before the Court for today.

22        His marriage -- I mean, divorce is ugly.  There's just no

23   question about it.  And when it involves three minor children,

24   it gets even uglier.  But you know, he wasn't charged with

25   abusing anyone during that incident.  He was charged with not

leaving.  And I think that kind of speaks to whether or not
he is a violent individual.  I don't think that fits the
characterization of what he is like.

He didn't have much guidance as a youth, and he's rural
and he's uneducated.  I believe he has a 10th grade education.
But he has a head on his shoulders.  He's extremely hardworking.
I don't know if I ever told Your Honor, explained the type of
work he does.  He does utility work.  He's out working on
these utility poles, heavy manual labor, sometimes up to 10
hours a day.  And he's just -- he works all the time.  And he
supports his children, and that's what keeps him going.

He's being sentenced under the aggravated assault
guideline.  I understand the legal dynamics behind it, but
I don't really see -- I just don't see aggravated assault.
And I think that there are, again, you look at the spectrum of
cases.  I think he falls at the lower end of the spectrum, and
I think it's unfortunate that he ended up at 2A2.2 as opposed
to 2A2.4.  Had he been sentenced under 2A2.4, he would have
been, even with a Category II, he would have been 10 to 16
months.  At a Category I, he would have been 8 to 14 months.

Unfortunately, it's because of the fact that he did this
with an intent to commit another felony.  I understand the
legal argument.  I think some are taking issue with the
characterization that both those offenses can count as
committing the offense with intent to commit another felony,

1   but no matter how it shakes out, I think he's at the lower

2   end of the spectrum for an aggravated assault case.

3       I mean, he doesn't have an obstruction charge.  He wasn't

4   charged with going in and actually interfering with the

5   electoral count.  The bottom line is is that in terms of an

6   assault, he touched a National Guard's riot shield with his

7   shoulder when he was pushing back on them.  But he pulled back

8   seconds later.  Whether it's five seconds, whether it's seven

9   seconds, it doesn't really matter.  The bottom line is it was

10  short-lived.  He physically harmed no one that day despite the

11  fact there's potential within a group for physical harm to

12  occur.

13      And, finally, he didn't enter the Capitol.  Which is

14  significant, because --

15              THE COURT:  Yes, it is.

16              MR. DAVIS:  And that also shows he has a head on his

17  shoulders.  And despite the fact that he --

18              THE COURT:  Well, I don't know if it goes that far.

19  He didn't go into the Capitol, and I'm definitely taking that

20  into account.  I'm not sure he didn't go into the Capitol

21  because he wasn't successful, but he didn't go into the

22  Capitol.

23              MR. DAVIS:  Many smaller men made their way through

24  that window.

25              THE COURT:  Sometimes location and timing is

1     everything.  But I agree with you, he did not go into the

2     Capitol and I'm taking that factor into account.

3          MR. DAVIS:  And he didn't destroy any government

4     property that I've heard of.  I mean, I didn't hear that

5     he destroyed anything.

6          And finally, I think that -- and again, I don't mean to put

7     the Court in an awkward or -- between a rock and a hard place,

8     but I think the real losers here are his children, and

9     unfortunately this can become a self-perpetuating cycle.

10         THE COURT:  Oh, I fully agree with you.

11         MR. DAVIS:  So I would ask Your Honor at the end of

12    the day to take all these factors into consideration.  And

13    also, I believe the presentence report actually pointed out

14    that the fact of his support of his children could be grounds

15    for a variance.  So I would ask Your Honor to seriously

16    consider these factors.

17         I asked for a year and a day in my sentencing pleading.

18    I'm not certain if Your Honor thinks that's going to be

19    sufficient to satisfy the criteria dictated by 3553(a), but I

20    honestly -- I can honestly tell Your Honor that this man is

21    remorseful for what he did.  This is real.  I mean, if you

22    talk to him, you will understand that.  I mean, he was in a

23    bad place.  Hopefully, he's in a better place now.

24         THE COURT:  Thank you, Mr. Davis.

25         Mr. Capsel, is there anything you wish to say?

1          THE DEFENDANT:  No, ma'am.

2          THE COURT:  Sure?  This is your chance.

3          MR. DAVIS:  I have one final matter that I didn't

4     address.  It was the cases cited by the United States.  I

5     don't know if Your Honor looked at them closely, I imagine

6     you did.  But the *Hamner* case, that individual pled to a 231

7     offense.  The government sought 60 months, and he was

8     sentenced to 30 months.

9        But that man had a Category V criminal history, and he had

10    convictions for ADW, resisting arrest, battery on a spouse.

11    He was a violent individual.  His actual guidelines were 70

12    to 87 months, and they were cut off statutorily at 60 months.

13    Plus he had a dangerous weapon.

14    *United States v. Miller*, another case, that man also pled

15    guilty to an obstruction count.  His guidelines were 41 to 51

16    months, the government sought 51 months, and he was sentenced

17    to 33 months.  And he had a dangerous weapon for guideline

18    purposes on him.

19         THE COURT:  Okay.

20         MR. DAVIS:  So I don't really think they give as much

21    guidance in terms of disparity.  I think we have to look at

22    Mr. Capsel's behavior and assess what he did here.  I don't

23    think those cases give us much guidance.

24         THE COURT:  Okay.

25         MR. DAVIS:  Thank you, Your Honor.

1              THE COURT:  Thank you.

2         Sentencing is -- and I speak only for myself, but it's

3    the hardest part of my job; and I struggle and try really

4    hard to make each sentence reflect not only the offense --

5    the punishment for the offense that's convicted but to fit

6    the person.  And these January 6 cases are no different.

7         It is no secret about the seriousness with which I take the

8    actions of January 6.  This is nothing less than an attempt to

9    overthrow the government, to stop the peaceful transfer of

10   power, and it almost succeeded.

11        And it wouldn't have come anywhere near close to succeeding

12   if it weren't for the thousands of people that congregated on

13   the Capitol, damaged property, attacked law enforcement, and

14   forced their way inside.  So I don't need to reiterate how

15   seriously I take what happened.

16        And, Mr. Capsel, I don't know if you've had a chance to

17   think about your actions and what happened that day.  I think

18   you told the police that you viewed the Capitol as sacred

19   ground, and that's why you didn't go in.  I don't know if

20   that's true.  Maybe you just didn't go in because you didn't

21   get in.

22        But, if so, I kind of wonder why you were telling people to

23   hold the line, because the people who you were encouraging to

24   hold the line were trying to go into the Capitol.  But that's

25   neither here nor there.  I am giving you credit for not going

1      into the Capitol.

2        So, I mean -- look.  I was a career public defender.  I,

3      more than anybody, know that people are complicated.  People

4      are rarely all bad or all good.  And you watch the videos --

5      let's talk about -- let me go down to the nature and

6      circumstances of the offense.

7        You watch the videos in this case, and I watched the videos

8      in this case, and every single time I watch the videos and

9      look at the photographs of what was going on that day, I am

10      struck anew by how horrible this was, by how violent and

11      terrifying, and how the outnumbered and vastly unequipped law

12      enforcement officers were feeling that day as they were

13      basically struggling for their lives and wondering if they

14      were going to make it home to their kids.  And some of them

15      didn't.  And the people inside the Capitol who were hiding

16      under their desks calling their children to tell them they

17      loved them and telling them good-bye because they weren't sure

18      that they were going to.

19        Even the vice president, with all his protection, his

20      family, not wanting to get in that car and not knowing where

21      he was going, it was terrifying.  It was terrifying to

22      everybody who was there that day, to people watching around

23      the country, to people sitting in this city.  And I hope you

24      have had a chance to understand the nature and seriousness of

25      the offense, because I cannot overemphasize how serious they

1   were and how close we came, and the effects of that day are

2   being felt -- they revealed cracks in our country, divisions

3   in our country.  I don't know if we'll ever recover from that.

4   And there are people out there who are vowing to succeed next

5   time.

6       You know, Mr. Capsel, I'm not punishing you for your

7   political beliefs.  That video, that TikTok thing you shared,

8   it's offensive, it's vulgar, but that's not why you're here.

9   I'm not going to give you extra jail time for that.  It

10  shows -- it's unfortunate.  It reflects an unfortunate,

11  vulgar, violent trend in our political discourse that reflects

12  a larger division in this country that is very, very troubling

13  to me.  But that's not the nature and circumstances of the

14  offense that I'm concerned about.

15      I'm concerned that you got in your car, however you got

16  here, and drove all the way to Washington, D.C., to mix it up.

17  Because that's what I think happened.  You know, clearly you

18  have your political beliefs.  You know, there was an election

19  that a lot of people believe was wrongly -- that someone stole

20  an election years ago that was ultimately decided by the

21  Supreme Court.  A lot of people felt that that election was

22  stolen.

23      You know what they did?  They went on about their lives,

24  and the next time they voted.  And this country withstood

25  that.  But on January 6, people felt the need to come and

1    basically stop the transfer of government.  That's never

2    happened in this country's history.  And you were part of it.

3    And it doesn't happen without you.  It doesn't happen without

4    all those people pushing and shoving and yelling and screaming

5    while patriots, people who work for the government, people who

6    are trying to do their job inside that building were cowering

7    for their lives.

8        And I hope you've had a chance to reflect on it.  I don't

9    know if your remorse is real or not, but I hope it is, because

10   look where it's landed you.  And I hear from law enforcement

11   officers frequently and I see them testify, and they're still

12   suffering.  They're suffering from posttraumatic stress

13   disorder.  Officers have killed themselves.  Officers have had

14   to retire early because they can't physically perform their

15   jobs anymore.  Officers are receiving therapy and counseling

16   because of what happened that day.

17       It was terrifying.  Some of those officers were new.  They

18   were young.  They didn't know if they were going to make it

19   out.  Some of them were slipping in their own blood.

20       So it might seem to you that you were out there mixing it

21   up, yelling, you know, just coming in for a rumble that day,

22   but what you were participating in was serious.  You didn't go

23   into the Capitol.  You get credit for that.  You didn't break

24   anything, you didn't steal anything, you didn't fortunately

25   cause any serious injury.  All those things are things that

weigh in your favor, which is why you've been allowed to be on release, which is why the government has given you the plea offer it did.

But you also didn't leave.  You were there.  You're yelling.  You're getting sprayed.  You're encouraging people. And it's nighttime.  There's a curfew.  You know, a state of emergency has been declared.  Everybody is supposed to be off the streets, and you're still hanging out their taunting law enforcement officers.  You know, taunting people who took an oath to support and defend the constitution.

Yes, sir.

THE DEFENDANT:  Your Honor, the reason I was still there for such a long period of time and then going over, I came in on a bus.  I was leaving on the train, but when all this happened, we were camping out.  There were people camping and I'm not sure if it was D.C. police, National Guard, who, but they took all our stuff, my wallet, my jacket, everything I had.  I was kind of stuck out there for a while.

THE COURT:  I understand.  I did read that you were in a tent and the guard were doing -- they had to clear the area. They didn't know if people had left bombs, weapons.  It was a scary time.

But what I'm seeing is somebody just mixing it up:  You're mad; you're out there; you're angry.  And that's resulted in a felony conviction that's going to be with you for the rest of

1    your life.

2        Your history and characteristics, and this is what I'm

3    talking about when I say I was a public defender and people

4    are complicated.  If you look at those videos, you're

5    horrified, and you look like a very dangerous, scary guy.

6    But I read the presentence report, and -- you know, you had

7    a tough road coming up.

8        And you have three children who you're supporting and who I'm

9    sure love you because that's what children do, right?  They love

10   you.  They don't care what you did at the Capitol.  And you're

11   working, you're supporting your kids, and that means something.

12   So I'm considering those factors as well.

13       You're not a monster.  You're not, you know, somebody who's

14   incapable of turning their life around.  I see that you have --

15   you know, you're a mixed bag.  You've been getting in trouble,

16   and this is the biggest one so far, and if you don't learn from

17   this -- because what I think you've been struggling with,

18   Mr. Capsel, and it may be a result of your upbringing, is

19   impulse control.

20       I can tell you that, both as a public defender and sitting

21   here as a judge, I see so many people before me who cannot

22   control their impulses, and they do stupid things, often violent

23   things, and they end up in front of me.  And I think you

24   struggle with impulse control and anger management.  And if

25   you don't get help to deal with those things, you could end up

1    hurting somebody worse, getting a longer sentence, or being

2    injured or killed yourself if you continue on this road.

3        The types of sentences available I don't need to go into

4    because we've talked about all the guidelines range.  You have

5    family who loves you.  You live with your younger brother who

6    has had his own physical challenges.  Your mom loves you.  You

7    are obviously a person of worth.

8        The range you agreed to in your plea agreement is between

9    27 to 33 months.  The government's asked for 31, your lawyer's

10   asked me to vary down and give you a sentence of a year and a

11   day.  And the probation office recommendation -- I've already

12   told you the sentences that you're looking at.

13       With regard to the need to avoid sentence disparities, those

14   are -- that's difficult in these cases because we never had

15   anything like this happen before.  And my sentences have been

16   all over the place.  It's no secret that I have sometimes given

17   more than what the government's asking for, once in a while

18   giving a bit less, almost never giving what probation's been

19   recommending.  Because I take these cases very seriously.  But

20   I'm looking at you as an individual and I do try and make each

21   sentence fit what you did and who you are.

22       The government -- I think your lawyer cited the case of

23   Moises Romero, which is one of my cases.  Mr. Romero did go

24   inside the Capitol.  He brought with him protective goggles.

25   He was engaged in shoving and pushing.  And I gave him a year

1    and a day.  Mr. Romero had, up to that point, lived a very, very

2    law-abiding life.  He was a nurse, he had shown incredible

3    remorse.  And I believe there are a number of factors that make

4    this case different.

5        I will note that there were -- in the last five fiscal years

6    there were 23 offenders whose primary guideline was §2A2.2, with

7    a final offense level of 17 and criminal history category of II.

8    For the 22 offenders who received a sentence of imprisonment in

9    whole or in part, the average length was 25 months, and the

10   median length was 27 months.

11       However, during that same time period, there were 51

12   offenders whose primary guideline was §2A2.2, with a final

13   offense level of 17 and a criminal history category of I, and

14   for them the average length of imprisonment imposed was 21

15   months, and the median length of imprisonment was 24 months.

16       Here's the thing:  And maybe I am wrong.  I think you're --

17   hurt people hurt people.  I know it's sort of a cliché, but it

18   actually is true.  And I think a lot of your anger and lack of

19   impulse control comes from your background in which a lot of

20   people let you down in your life.  Your lawyer's right.

21       Children are sort of our chance to get it right.  And there

22   are two ways this can go:  You can continue this cycle that

23   you've been in and pass it down to your children and they end

24   up making the same mistakes you've made.  I see it here all the

25   time.  Defendants in front of me whose fathers were in prison

1   when they were born, whose uncles were in prison, whose brothers

2   were shot, and the cycle continues.  And it's very, very

3   distressing and demoralizing.

4       But children give you an opportunity to get it right.  And

5   they give you an opportunity to break that cycle.  Because as I

6   said, they're children; they think you're the greatest thing in

7   the world.  And I believe your support of your children and your

8   desire to be a father to those children, I hope it will make you

9   see that you gotta change.  You gotta fix this.

10      And Mr. Davis is right.  If I give you 31 months in this

11  case, the people -- you could do 31 months.  I think you can.

12  I've had people who were going to have a hard, hard time in

13  jail.  They just were not constitutionally able to, you know,

14  withstand that.  And I've still given them jail time.

15      But who will really suffer in this case is your children.

16  They'll suffer not only for the lack of you in their life, which

17  is considerable, but that happens.  Lots of defendants have

18  children.  But the real problem that they're going to have is

19  the financial support that you have been providing to them.

20  And I don't think they should pay the price for your behavior.

21  I don't think I'm inclined to make them pay that price.  And I

22  think they will if I give you 31 months.

23      On the other hand, I don't want to reward you.  I don't want

24  you to use your -- and you haven't used your kids as an excuse.

25  I don't want to reward you for this kind of behavior.  But I

1   think the total circumstances and facts of this case,

2   everything, what you did, who you are, your circumstances, your

3   employment history, make this -- this may be the first case of

4   the January 6 cases I've had, I think, where I am going to vary.

5       And I'm doing it because I believe that with your work

6   history, with how you're working and what -- and the support

7   that you're providing for your children will be seriously

8   affected, and frankly, it's one of those cases where if you

9   don't get it after two years, you're not going to get it after

10  three years.  You don't get it after -- you have to get it on

11  your own.  I don't think the difference between a year or 18

12  months is going to make you understand.  If you don't understand

13  it now, if you don't understand it based on the sentence I give

14  you, I don't think it would make any difference.

15      But I do believe a sentence of incarceration is warranted.

16  There are people out there who are thinking about doing this

17  again, and they have to understand that if they ever try

18  anything like this again, they're not going to be given home

19  detention to sit at home and watch TV.  They're going to jail.

20  At least in this court.

21      If you could stand, Mr. Capsel, with your lawyer.

22      Based on my consideration of all the factors, §3553(a)

23  factors, I'm going to now state the sentence to be imposed.

24  It is the judgment of this court that you, Matthew Capsel --

25  and I will tell you I believe that the recommendation of the

1    probation office is the correct one in this case.

2        It is the judgment of this court that you, Matthew Capsel,

3    are hereby committed to the custody of the Bureau of Prisons for

4    a term of 18 months on Count 1.  You're further sentenced to

5    serve 36 months, that's three years of -- excuse me.  Wait a

6    minute.  24 months, excuse me.  24 months of supervised release.

7        I've had cases where I've sentenced a period of incarceration

8    and there's been no supervised release followed because I think

9    the people were -- you know, it was unnecessary.  But I think

10   it's necessary here.  You need some structure when you come out.

11   You need some programs, you need somebody checking in and

12   keeping an eye on things.  You need watching for a while.

13       So you're further sentenced to serve 24 months of supervised

14   release and to pay a $100 special assessment.  You must pay

15   restitution in the amount of $2,000 to the Architect of the

16   Capitol pursuant to the plea agreement.  The Court finds that

17   you do not have the ability to pay a fine and therefore waives

18   imposition of a fine in this case.

19       The special assessment of $100 and restitution are

20   immediately payable to the Clerk of the Court for the U.S.

21   District Court of the District of Columbia.  You may pay the

22   restitution in monthly installments of $150.  Within 30 days of

23   any change of address, you shall notify the Clerk of the Court

24   of the change until such time as the financial obligation is

25   paid in full.

1    Within 72 hours of release from custody you shall report in

2    person to the probation office in the district to which you're

3    released.  While on supervision you shall submit to the

4    collection of DNA.  You shall not possess a firearm or other

5    dangerous weapon, you shall not use or possess an illegal

6    controlled substance, and you shall not commit another federal,

7    state, or local crime.

8    You shall also abide by the 13 standard conditions of

9    supervision adopted by the U.S. Probation Office and listed in

10   the presentence investigation report, as well as the following

11   special conditions:

12   You must pay the balance of any restitution, as I've already

13   said, at a rate of $150.  You must submit to substance abuse

14   testing to determine if you have used a prohibited substance.

15   You must not attempt to obstruct or tamper with the testing

16   methods.

17   You must participate in a mental health treatment program and

18   follow the rules and regulations of that program.  The probation

19   officer in consultation with the treatment provider will

20   supervise your participation in the program.

21   I'm not going to impose financial information disclosure or

22   financial restrictions in this case.  I don't think it's

23   warranted.

24   With regard to reentry progress hearing, within 60 days of

25   release from incarceration or placement on supervision -- well,

1    actually, no.  Hold on.  Is there a reentry court where he is?

2    There's a recommendation for a reentry progress hearing.

3    Ms. Willett?

4         PROBATION OFFICER:  Yes, Your Honor.  We recommend that

5    in cases where it's anticipated that the defendant might

6    receive a period of incarceration.  So when he returns to the

7    community the Court can address whether or not the Court wants

8    to transfer jurisdiction of the case, not supervision, but

9    jurisdiction.  So we recommend it for those reasons.  If the

10   Court is inclined to retain jurisdiction of the case --

11        THE COURT:  Yeah.  I'm going to retain jurisdiction but

12   transfer supervision.  In other words, I'm going to keep the

13   case.  If there are problems on supervised release.  But

14   you'll be supervised by a probation office in your district.

15   I'm not going to impose a reentry provision.

16      All right.  Probation office.  You shall participate also

17   in any educational or vocational skills training program as

18   approved and directed by the probation office.  This is the

19   least restrictive means of advancing your rehabilitation.  The

20   probation office shall release the presentence investigation

21   report to all appropriate agencies in order to execute the

22   sentence of the Court.  Treatment agencies shall return the

23   presentence report to the probation office upon Mr. Capsel's

24   completion or termination from treatment.

25        Pursuant to 18 U.S.C. §3742, Mr. Capsel, you have a right

1    to appeal my sentence subject to certain rights of appeal that

2    you waived as part of your plea agreement in this case.  If

3    you choose to appeal, you must file an appeal within 14 days

4    after I enter judgment.  And if you're unable to afford the

5    cost of an appeal you may request permission from the Court to

6    file an appeal without cost to you.

7        As set forth in the plea agreement, the government pledged

8    to move to dismiss the remaining counts of the indictment

9    against Mr. Capsel.  Mr. Brady, do you wish to do so now?

10           MR. BRADY:  Yes, Your Honor.  We did file an

11   information at the time of the plea.

12           THE COURT:  You did?  Okay.  So never mind.

13       All right.  Now, with regard to your status pending

14   imprisonment, Mr. Brady, do you have any objection to allowing

15   Mr. Capsel to voluntarily surrender?

16           MR. BRADY:  Your Honor, given it was a crime of

17   violence, I would object.  This sentence has been pending for

18   a long time for him to get his affairs in order.  I am

19   sympathetic to the holiday season, Your Honor, but he did

20   commit two acts of violence in addition to the violent

21   overthrow of the United States government.  I know he's not

22   charged with that, but the overall mob's goal that day to

23   which he participated.  So we would.

24           THE COURT:  Okay.  I'm not going to order you detained

25   today.  The holidays.  Maybe I'm having a weak moment.  Other

1    than people who already were detained, I haven't ordered

2    immediate detention in most of these cases, unless, as I said,

3    people were already detained, and usually because they were

4    violent.  You've complied with your conditions of release.  I

5    think I told you at the time you first came before me that it

6    was important that you comply with your conditions of release,

7    and it would be important one day.  At your plea and today,

8    those are the days.

9         You've been working, you're complying with your conditions

10   of release, you got three kids who I don't want to do this to

11   them for their Christmas.  And I'm going to allow you to

12   voluntarily surrender at a time to be arranged.  Your lawyer

13   will be in touch with the probation office.  I think you have

14   to meet with probation now to go over all of that.

15        Let me caution you about your conduct, though.  Because

16   between now and when you surrender, if you pick up any new

17   charges or violate your conditions of release, as I told you,

18   it would be very bad for you.  Not only would you be

19   immediately detained, you may be subject to contempt of court,

20   you may be subject to enhancement for whatever charge you pick

21   up.  And if you don't turn yourself in when you're supposed to

22   voluntarily surrender, you're going to pick up a new charge

23   punishable by 10 years, consecutive to anything I give you.

24        So the upshot of all this is go to work, take care of your

25   kids, continue to follow your conditions of release and stay

1    out of trouble, Mr. Capsel.

2        Mr. Davis, do you have a request or a recommendation for a

3    Bureau of Prisons facility?

4            MR. DAVIS:  Other than as close as possible to the area

5    that he's from.

6            THE COURT:  And where is it you live now?

7            MR. DAVIS:  He lives in Ottawa, Illinois, which is

8    about an hour and 45 minutes outside of Chicago.

9            THE COURT:  I don't have any control over the Bureau of

10   Prisons.  I wish I did, but I don't.  But I can make a

11   recommendation.  So I will recommend that Mr. Capsel be housed

12   in a Bureau of Prisons facility as close as possible to his

13   hometown of Ottawa, Illinois.

14       Mr. Capsel, I say this a lot, and I mean it in every single

15   case.  I mean, like I said, this may be the first January 6

16   case I've given a variance in, and I hope you don't make me

17   regret it.

18           THE DEFENDANT:  I won't, Your Honor.

19           THE COURT:  A very wise man named Bryan Stevenson said,

20   and I agree, that we are not the worst thing we've ever done.

21   We're more than that.  The most important thing you can do

22   right now -- your children, they listen to you, but they

23   really watch.  They really watch you.  Okay?  And they're

24   going to know that you made a mistake and that you did a bad

25   thing.  What your children are watching is how you come back

1    from that.  Because everybody makes mistakes.  And you made a

2    big one, a serious one.  But it's how you live your life.

3    Right?  How you come back from that.  That's what your

4    children are watching.  That's what you need to show them.

5        Nobody wants your kids following the path you did.  You

6    have a chance to break that cycle and support your children

7    and be there for them.  As it is, your actions are going to

8    take you away from them for a year and a half.  And they will

9    suffer for that.  But you have an opportunity to show them

10   that you can make mistakes but you can go on and fix it.  All

11   right?  So good luck to you, sir.

12       Anything further, Mr. Brady?

13           MR. BRADY:  No, Your Honor.

14           THE COURT:  Mr. Davis?

15           MR. DAVIS:  Nothing further, Your Honor.

16           THE COURT:  Thank you.  Have a good holiday, everyone.

17       (Proceedings adjourned at 5:07 p.m.)

18

19

20

21

22

23

24

25

43

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.




/s/ Bryan A. Wayne
Bryan A. Wayne